**UNITED STATES of America**
v.
**Claude L. SMITH, Appellant.**

**UNITED STATES of America**
v.
**James P. JARVIS, Appellant.**
**Nos. 72–1593, 72–1600.**

United States Court of Appeals,
District of Columbia Circuit.

No. 72–1593 Argued March 14, 1973.

Decided April 27, 1973.

See also, D.C.Cir., 476 F.2d 884.

Franklin M. Schultz, Washington, D.
C. (appointed by this Court), for appel-
lant Smith. J. Sumner Jones, Washing-
ton, D. C. (appointed by this Court),
entered an appearance for appellant
Smith.

William E. McDaniels, and Aubrey
M. Daniel, III, Washington, D. C., were
on the brief for appellant Jarvis.

Lawrence T. Bennett, Asst. U. S. Atty.,
with whom Harold H. Titus, Jr., U. S.
Atty., and John A. Terry, and Herbert
B. Hoffman, Asst. U. S. Attys., were on
the brief, for appellee.

Before FAHY, Senior Circuit Judge,
and LEVENTHAL and ROBB, Circuit
Judges.

ROBB, Circuit Judge:

On the night of July 3, 1971 the appellant Smith shot and killed Elroy W. Williams with a pistol Smith borrowed from the appellant Jarvis[1] a few minutes before the shooting. The appellants were indicted and convicted of second degree murder and carrying a dangerous weapon, and they appeal.

The killing occurred on the sidewalk of Georgia Avenue, in Washington. It was not disputed at the trial that Smith fired a single shot that killed Williams, nor was it disputed that Jarvis gave Smith the pistol that Smith used. There was agreement also that several hours before the shooting Smith and Williams had a fight on Georgia Avenue. During this fight Williams cut Smith on the chest with a razor, inflicting a wound two inches long that bled freely and required four stitches.

The government's theory was that Smith, angered by this assault, borrowed the gun from Jarvis and immediately approached Williams on the street, intending to shoot him. The government's proof tended to show that Williams did not have a weapon in his hand when he was shot. The government also introduced evidence that Jarvis handed the gun to Smith on the street, immediately before the shooting, making Jarvis an accessory to the murder.

On the other hand the defendants contended that Smith saw Williams on the street and went to him to get an explanation for the earlier cutting incident and to obtain payment for his medical expenses. Smith testified that to protect himself he went into Jarvis' store, which was nearby, and borrowed a gun from Jarvis. He then approached Williams and asked, "Elroy, why did you cut me?" Williams responded with an obscenity and came at Smith with his razor. Smith kicked Williams but "he kept coming with the razor" and Smith "took the pistol and shot him".

The testimony at trial disclosed that Frank M. Twitty was at the scene in company with the witness Jackson and that after the shooting he took Jarvis' pistol back to him. Twitty was in court under a subpoena issued on behalf of Smith, and on the *voir dire* counsel identified him to the prospective jurors as a defense witness.

On the morning of the second day of trial counsel for Smith addressed the court in the absence of the jury, stating:

> * * * It was brought to my attention at the conclusion of yesterday's proceedings in Court, after having spoken with both defendants, Mr. Frank Twitty and Mr. Jerome Jackson, that the Assistant United States Attorney proceeding in this matter had spoken to Mr. Twitty outside of the courtroom and told him that if he took the stand, he might be prosecuted for concealed deadly weapon, he might be prosecuted as a principal in this matter as an aider and abettor.
>
> This was done after defense counsel had introduced Mr. Twitty to the jury or the prospective jury panel as a witness.
>
> It is the feeling of counsel for the defendant Smith that the Government well knew of this situation prior to testimony being taken and this matter proceeding. And that the manner in which this was handled is prejudicial, severely prejudicial, to the defense of Mr. Smith. (Tr. 110)

Responding to this statement the prosecutor said:

> * * * I would like to advise the Court, as an officer of this Court and as an Assistant United States Attorney in this case, after Mr. Jackson testified as to the events which occurred on July 3rd, which are part of the record, and the events which occurred after the shooting in which he talked about Mr. Twitty's involvement, I felt it incumbent upon me to advise

---

1. The case of United States v. Jarvis, No. 72-1600, was considered and decided on briefs without oral argument.

Mr. Twitty what I did advise him, which was to seek an independent attorney and not the attorneys for Mr. Smith and not the attorneys for Mr. Jarvis, to advise him what his constitutional rights were with respect to the Fifth Amendment, because if his testimony approached what Mr. Jackson had indicated by his implications, he could be potentially prosecuted for carrying a dangerous weapon, which was shown, and on obstruction of justice by concealing the weapon, bringing it back to Mr. Jarvis, and also he would be potentially liable as an accessory after the fact after this murder.

That as to his rights, he is entitled to advice of a lawyer. The Court of Appeals has consistently recommended that an independent lawyer be appointed by the Court to speak with Mr. Twitty before he testified. (Tr. 110, 111)

The court then stated:

Let the record show that this matter was discussed in chambers.

\*　\*　\*　\*　\*　\*

And on the basis of that, we have asked the Public Defender Service to send over a lawyer to the courthouse for consultation with Mr. Twitty at 3:00 o'clock this afternoon when Mr. Twitty is due to arrive.

As a result of that, Mr. Twitty will be properly represented by counsel. And if he wishes to testify, it will be up to him. If he doesn't wish to testify, that will also be up to him. But it will be done after consultation with independent counsel. (Tr. 111, 112)

After consultation with an attorney from the Public Defender Service Twitty informed the court that he had decided not to testify because "it wouldn't be in my best interests to testify, that different charges could be brought against me if I testify in this case." (Tr. 242) He was then called to the stand by counsel for Smith and the following occurred:

BY [COUNSEL]:

Q. Mr. Twitty, do you remember speaking to me yesterday afternoon at the conclusion of the day in Court?

A. Yes, sir.

Q. Do you remember the conversation that we had?

A. Yes, sir.

Q. Do you remember telling me, sir, that you had been told by the Assistant United States Attorney \* \* \* in this matter, that if you testified, you were told this yesterday, that if you testified in this case you would be charged with CDW, obstruction of justice, and as a principal in a murder?

A. Your're right.

THE COURT: Did he say you could be or would be?

THE WITNESS: Would be.

\*　\*　\*　\*　\*　\*

CROSS-EXAMINATION

BY [THE PROSECUTOR]:

Q. Mr. Twitty, what did I tell you? Be honest now, what did I tell you?

A. You asked me did I want to talk to you. I said I didn't have anything to say to you.

Then you asked me did I have a lawyer. Then I told you that I did have a lawyer.

Q. Did I tell you to see a lawyer befor you testified?

A. You said this also.

[Prosecutor]: That's all I have.

THE COURT: Thank you, Mr. Twitty. You may step down. (Tr. 243, 244)

A critical issue was of course whether Williams was attacking Smith with a razor when he was shot. On this issue a government witness, Jerome Jackson, testified that he saw Williams "come out of his pocket" with his hand and move towards Smith, but that he saw no weapon in Williams' hand. Another government witness, Bernard Hawkins, testified that Williams "had his hands to his side" and that he saw no weapon. On the other hand, as we have said, Smith swore that Williams was advancing on him with a razor; and Jarvis corroborated this testimony.

In a tender of proof counsel for Smith represented to the court that Twitty would have testified that he witnessed the shooting and that "he definitely saw a razor in the hand of Elroy Williams" at that time. (Tr. 336) Such testimony was of course vital to the defense and Smith was entitled to put Twitty on the stand without interference or intimidation by the prosecutor.

■■■ We think the prosecutor's warning was plainly a threat that resulted in depriving the defendants of Twitty's testimony. The government argues in its brief that Twitty had a right to be advised that he might incriminate himself and be subject to prosecution if he elected to testify, and the government suggests that the prosecutor was only protecting Twitty's rights when he warned him. Even if the prosecutor's motives were impeccable, however, the implication of what he said was calculated to transform Twitty from a willing witness to one who would refuse to testify, and that in fact was the result. We therefore conclude that the prosecutor's remarks were prejudicial. As the Supreme Court of Michigan observed in People v. Pena, 383 Mich. 402, 406, 175 N.W.2d 767, 768 (1970), "[a] prosecutor may impeach a witness in court but he may not intimidate him—in or out of court." *See also* Bray v. Peyton, 429 F.2d 500 (4th Cir. 1970); People v. Butler, 30 Mich.App. 561, 186 N.W.2d 786 (1971). If the prosecutor thought the witness should be advised of his rights then he should have suggested that the court explain them to Twitty. The matter would then have been presented to Twitty by the court without any threats or implication of retaliation.

The treatment of the witness Twitty requires the reversal of Smith's conviction. We have considered his other assignments of error but find them without merit.

■■■ Jarvis was convicted upon the theory that he aided and abetted Smith. Logically it follows that if the principal Smith had been acquitted Jarvis should also have been found not guilty; in other words error that damaged Smith's defense was also prejudicial to Jarvis. Accordingly we think the interests of justice require that the conviction of Jarvis should also be reversed. In reversing his conviction we have not considered the question he raises, whether the evidence was sufficient to support a verdict against him.

The judgments are reversed.