**Kenneth W. SWANN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 7306.**

District of Columbia Court of Appeals.

Argued Jan. 15, 1974.

Decided Oct. 23, 1974.

John W. Nairn, Washington, D. C., appointed by this court, for appellant.

E. Lawrence Barcella, Jr., Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before KELLY, KERN and NEBEKER, Associate Judges.

NEBEKER, Associate Judge:

Appellant seeks to overturn his convictions for burglary while armed and armed robbery by attacking certain procedures followed by the government during and prior to trial. He argues that pretrial photographic and corporeal identifications were impermissibly suggestive and that they tainted subsequent lineup and in-court identifications. He also urges that the government impermissibly interfered with the presentation of his defense at trial by arresting a person whom appellant had planned to call as an alibi witness just before she was to testify. We discuss the relevant facts in each part of this opinion. The judgment of conviction is affirmed.

I

The complaining witness, Mrs. Alberta Chambers, the resident manager of a northwest Washington apartment house, testified that she was accosted at the door of her apartment in midafternoon by appellant who, armed with a pistol, demanded money. He backed her into her living room, struck her in the head with his pistol, and threatened her with death when she contended she had no money. Finally, he found her pocketbook and removed some $50 from it. The incident, according to her, took five minutes and occurred in "excellent" light during which time she had "continuous opportunity" to view appellant. She had seen appellant on previous occasions when he had come to the apartment building to visit a friend who also lived there. Although at first hesitant to call the police in light of appellant's threats of reprisal against her children and herself, she reported the crime within a few minutes and gave a detailed description of the robber.

One Detective Reeder, assuming responsibility for investigation of this robbery, first showed Mrs. Chambers a large book of photographs of suspects but she was unable to make an identification. Thereafter, he presented an array of ten photos from which she selected appellant's photo. Appellant's photograph was included in this array since during Detective Reeder's investigation he learned that Mrs. Chambers had seen appellant getting into a small red auto that was usually parked near her residence. In his surveillance of the area, Detective Reeder located the car and traced it to appellant. Knowing appellant's identity, he placed his picture in the ten-photo array.

At trial the government was unable to produce this second array from which Mrs. Chambers made her identification because Detective Reeder had returned those photos to his book. He did describe them during his testimony at trial as "Metropolitan Police [Department] official photographs," depicting black males.

Mrs. Chambers also identified appellant on a date after she had selected his photo and *before* any lineup when she saw him through her window as he stood across the street talking with Detective Reeder. The detective had come to speak with her, but recognized appellant on the street and engaged him in conversation. After this encounter, the detective went to Mrs. Chambers' apartment and asked her if she had seen him across the street and if she had seen him talking with another man. She answered "yes" to both questions. Detective Reeder then asked, "Was that the young man?", and she replied, "[T]hat's him."

During her testimony, Mrs. Chambers was shown a photograph of appellant which was taken after his arrest. She identified the coat he was wearing in the picture as just like the coat worn by her attacker.

■ Appellant argues that the on-the-street meeting of appellant and Detective Reeder in full view of Mrs. Chambers who was across the street at her window was so unnecessarily suggestive as to deprive appellant of due process. He claims this meeting amounted to an unjustified one-

man showup and that the questions Detective Reeder asked Mrs. Chambers about the meeting prompted her subsequent identification. We conclude, without reaching the question whether this purely fortuitous sighting involves any constitutional issue,[1] that there was no danger of misidentification. Mrs. Chambers had previously seen the appellant in her own apartment building on several occasions before the attack and on the very day of the offense. *See* United States v. Inge, 494 F.2d 1102 (D.C. Cir., 1974); United States v. Anderson, 490 F.2d 785 (D.C.Cir., 1974).

As to appellant's complaint that the fact of the photographic identification should not have been placed in evidence because of the inability to reconstruct the precise photographic array, we are of the view that reversal is unwarranted. Our reason for this conclusion is the independent basis for the identification of appellant. Moreover, defense counsel was supplied the officer's album from which that array was constituted, and he made no further complaint relying only on the pretrial motion which was couched in the most general terms.

## II

The events occurring during the trial that give rise to the allegation that appellant was precluded from presenting his defense spring from a defense witness threatening Mrs. Chambers outside the courtroom during trial.[2] Appellant's witness as to alibi, Mrs. Delores Williams, was purportedly going to testify that appellant was in her apartment during the time of the offense. The government knew that Mrs. Williams was to be his witness at trial but was not aware that appellant was going to plead an alibi as his defense. *See* Super.Ct.Crim.R. 16–I. Before appellant called Mrs. Williams to the stand she was arrested on a warrant[3] on a charge of obstruction of justice upon the complaint of Mrs. Chambers and Detective Reeder.

Soon after the complainant began her testimony at the suppression hearing, the prosecutor represented to the trial judge:

> I didn't get the complete story from Mrs. Chambers [the complainant] and the gentleman [a neighbor who had accompanied her to court]. She was extremely upset and agitated.
>
> \*   \*   \*   \*   \*   \*
>
> [A]nd . . . the other gentleman . . . told me that they [Williams and two others] were saying all kinds of things, of threatening things, . . . I didn't pursue it any further with them.
>
> . . .

Counsel for both parties and the trial judge were subsequently told that warrants had been obtained for the arrest of two unidentified parties. Prior to the presentation of the defense case, the judge and defense attorney learned from a deputy marshal that Mrs. Williams had been arrested. The prosecutor advised the court:

> Reeder interviewed Mrs. Chambers and Mr. White [her neighbor and companion at the trial] and at that point remarks were threats; because I think he learned from his interview with them [Mrs. Chambers and Mr. White] either one or all of these people out in the hallway [Williams and two companions] said to Mrs. Chambers and Mr. White, "We're

---

1. *See* Bowler v. United States, D.C.App., 322 A.2d 281 (1974) (Nebeker, J., concurring).

2. The description of what happened as shown on the affidavit in support of the warrant for arrest was:

   The complainant, Alberta Chambers, reports that while waiting in the hallway in front [of] courtroom B–103, to testify in the case Kenneth W. Swann she was approached by the above subject, Jane Doe known as Delores, who stated "that I'm going to get you and that big-bellied son-of-bitch and I'm going to catch you [m—f—] and beat the [s——] out of you." The trial started at 1:30 p.m. and the time of the threat according to the affidavit was 2:15 p.m.

3. *See* note 2, *supra*.

gonna get you." That's all I know; I haven't had anything to do with that.

The witness Williams was assigned counsel who subsequently stated to the trial court that he had advised her "to invoke the Fifth Amendment" if appellant called her to testify. After some further colloquy with counsel, the trial judge announced that he was satisfied that she was entitled to the privilege. Appellant's trial counsel decided that he would not call Mrs. Williams as a witness so as to avoid the tactical disadvantage of having her invoke the privilege from the stand in the presence of the jury.

Appellant contends now that he was deprived of testimony absolutely crucial to his defense by the action of the government in arresting his alibi witness before she could testify on his behalf. We are not persuaded that the arrest—an action by the government, warranted as it was and not undertaken by the prosecutor as a purposeful attempt to weaken the defense—resulted in a denial of appellant's rights to due process and a fair trial. It must be remembered that the primary and proximate event leading to the witness' claim of the self-incrimination privilege was her own illegal act. That act tended to undermine the very integrity of the judicial process, and compelled immediate arrest. Carbo v. United States, 82 S.Ct. 662, 7 L.Ed.2d 769 (1962); cf. Blunt v. United States, D.C.App., 322 A.2d 579 (1974). The privilege to refuse to testify against herself arose at that point and would have been available even if the arrest warrant had not been sought and executed. Since counsel and the trial judge knew of the threat, it would have been necessary, irrespective of whether the witness had been arrested, to follow the same process which lead to the claim of the privilege. It is beyond question that the fact of the threat was relevant to bias and thus credibility of the witness and would have been a proper subject for cross-examination. White v. United States, D.C.App., 297 A.2d 766, 768 (1972).

The fact that appellant's witness attempted an obstruction of justice by a fully cognitive and volitive threat to the complainant makes this case different from those relied on by appellant and our dissenting colleague. Here the self-incrimination privilege springs from a separate and completed criminal act of the witness having a direct impact on the trial then in progress. It was not the government but the witness who caused the claim of privilege. It is quite a different case when the court (Webb v. Texas, 409 U.S. 95, 93 S. Ct. 351, 34 L.Ed.2d 1920 (1972)), or the prosecutor (People v. Butler, 30 Mich.App. 561, 186 N.W.2d 786 (1971)), threatens a witness with perjury charges if he testifies for the defendant or if the prosecutor threatens a defense witness with prosecution for other offenses evidenced by his anticipated testimony (United States v. Smith, 156 U.S.App.D.C. 66, 478 F.2d 976 (1973)). The same is true where the government deports alien defense witnesses, making them unavailable, United States v. Mendez-Rodriquez, 450 F.2d 1 (9th Cir. 1971), or where it reinstates previously abandoned charges against a defense witness accusing him of sexual misconduct similar to that charged against the defendant in an effort to discourage testimony that complainant was a consenting and lewd woman (Bray v. Peyton, 429 F.2d 500 (4th Cir. 1970)).

The court thus concludes that appellant's conviction was not procured by identification procedures and testimony warranting reversal, or by governmental action depriving him of testimony in defense. The judgments of conviction are

Affirmed.

KERN, Associate Judge (dissenting):

While one arm of the government prosecuted appellant for robbery inside the courtroom, another governmental arm placed under arrest, his sole witness outside the very same courtroom just as he was preparing to call her to the stand to support by testimony his denial of the rob-

bery charge made against him by the complainant.

The arrest of the only defense witness was effected by the detective assigned to the case without the knowledge either of the Assistant United States Attorney in charge of its prosecution or the judge presiding over its trial then in progress. The act for which the defense witness Williams was arrested consisted of threatening words allegedly uttered by her to the complainant while they waited outside the courtroom where the trial was taking place. The strength of the case against Williams for "threats" may be inferred from the facts that (1) the government moved to dismiss the charge 11 days later and (2) the prosecutor's own evaluation in open court (Tr. I at 6–7) of what he understood had happened outside the courtroom, viz., "[T]hey weren't threats to Mrs. Chambers [complainant] and to him [a gentleman who accompanied her to the trial], I didn't pursue it any further with them."

The impact of the arrest on appellant's case was significant: his only witness, Williams, who was prepared to testify she had been with him at some place other than the scene of the robbery, determined upon conferring with her own attorney after arrest to invoke the Fifth Amendment if she was called to testify for appellant. Appellant's attorney, acutely aware of the narrow issue of credibility posed for the jury's resolution by complainant's assertion[1] and his client's denial of the robbery, decided as a matter of tactics not to have the witness invoke "the Fifth" before the jury. The jury found appellant guilty as charged.

To begin with, there can be no dispute that the testimony of Williams was crucial to appellant's defense and that he had a *constitutional* right to present his defense through the testimony of *all* his witnesses. Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). So, too, the act for which Williams was arrested, *viz.*, threats uttered to the government's witness outside the courtroom while the trial was in progress, was subject to the court's contempt power and susceptible to instantaneous remedial action by the judge presiding over the trial. Renfroe v. State, 104 Ga.App. 362, 364–365, 121 S.E.2d 811, 813–814 (1961); State v. Cooper, 64 N.M. 18, 322 P.2d 713 (1958); *see also* 52 A.L.R.2d 1297 (1957).

I doubt that even the majority would disagree that the proper course to have followed here would have been for the detective in charge of the case to have immediately informed the Assistant United States Attorney inside the courtroom of what had occurred outside the courtroom, for the prosecutor then to have fully reported to the trial judge on the record in open court, and, finally, for the court to have dealt sternly with the witness Williams.[2] Given the present unsatisfactory physical conditions of many of our courtrooms leading inevitably to co-mingling of witnesses from both sides in the hallways and waiting rooms, the potential for undue interference with witnesses is substantial and must be met with firm and immediate action on the part of the trial court. However, here, the court, in those presence almost literally the contemptuous conduct occurred, was not informed that a

---

1. She was the *only* eyewitness to his alleged crime.

2. I view the responsibility of the trial court in the instant case to have been one of balancing appellant's right to present unhindered his defense with the need to insure an orderly trial free from undue influence improperly exerted by any witness. A comparable situation is that of the unruly and obstreperous defendant at trial. The Supreme Court has recently held that the conduct of a defendant in the courtroom during his trial may be so disruptive as to justify the loss of his con-

stitutional right to be present at the trial. Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). However, the Court emphasized that a judge should remove a defendant from his trial *only* as a *last* resort and that courts must indulge every reasonable presumption against the loss of constitutional rights. So, too, the *arrest* of a key defense witness while the trial is in progress for conduct almost in the shadow of the witness stand is to be effected only as a last resort after exhausting all other reasonable alternatives, one of which was the exercise of the court's power of contempt.

key witness essential to the defense was being arrested for words uttered to another witness in the hallway. The impact of the witness' subsequent removal from the case has been noted above.

The majority's conclusion to uphold the action taken and affirm the conviction is disarmingly simple. "It was not the government," it says (op. at 7), "but the witness who caused the claim of privilege." It goes on to say (op. at 6), "It must be remembered that the primary and proximate event leading to the witness's claim of the self-incrimination privilege was her own illegal act." With all deference this analysis omits the critical fact that the arrest of Williams outside the courtroom by the detective without the knowledge of either judge or prosecutor was the event which triggered her claim. Certainly it may be *speculated*, as the majority appears to do, that even if Williams had not been arrested she *might* still have invoked the Fifth Amendment on the stand while testifying if the prosecutor cross-examined her about what she reportedly said to complainant outside the courtroom. However, in *that* situation, the government would not have been in the position, as it is here, of having *arrested* her, thereby eliminating her as a key defense witness. I believe we are required in this case to treat what *was* rather than what *might* have been when we are determining whether to uphold a prison sentence.

Since the witness Williams was essential to appellant's defense at trial and since the police arrested her for conduct outside the courtroom that could have been dealt with by the trial judge had he known what had happened, I believe the government[3] was responsible for the witness' unavailability to appellant, *see* United States v. Smith, 156 U.S.App.D.C. 66, 69, 478 F.2d 976, 979 (1973), and he is therefore entitled to a new trial at which he has the opportunity to present his whole case without government interference.[4]

---

3. I think it important to make clear that the prosecutor's conduct in this case was beyond reproach. Early in the trial he alerted the court to possible tension between the witnesses of the two sides. After the arrest of Williams, he urged with commendable candor and vigor that the trial judge hold an immediate hearing on the record to inquire into exactly what had transpired between complainant and Williams —still not entirely clear. Unfortunately, the judge declined to go into what he characterized as a "collateral matter."

Courts have understandably not been reluctant to criticize overreaching conduct on the part of prosecutors. Fair and responsible action on their part merits notice also.

4. The detective in this case was unable to produce at trial the array of ten photographs from which complainant made an identification of appellant. He had failed to abide by the applicable Department Order requiring the keeping of exact groups of photos shown witnesses for subsequent presentation in court. *See* Metropolitan Police Department General Order 304.7, Part I(G)(2) (Dec. 1, 1971). I would leave the determination of what action this "destruction-of-the-evidence" situation warranted to the trial court upon retrial. *See* United States v. Perry, 153 U.S.App. D.C. 89, 94–95, 100, 471 F.2d 1057, 1062–1063, 1068 (1972).