**STATE of Missouri, Plaintiff-Respondent,**

v.

**Eddie GARDNER, Defendant-Appellant.**

**No. 10330.**

Missouri Court of Appeals, Springfield District.

Nov. 10, 1977.

Daniel E. Letsch, Springfield, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Frank J. Murphy, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before HOGAN, P. J., and MOORE and NORTHERN, Special Judges.

HOGAN, Presiding Judge.

Defendant stands convicted of two counts of selling controlled substances. A jury has assessed his punishment at imprisonment for five years on each count. Defendant appeals, contending: (1) that there was no substantial evidence to support the verdicts; (2) that he was effectively denied his constitutional right to call witnesses in his behalf because police officers intimidated the wit-

nesses he proposed to call; (3) that hearsay testimony was admitted to his prejudice; and (4) that the trial court erred in giving Instructions 5 and 7.

■ As against a complaint that the evidence does not support a verdict of guilty, the court must view the facts in evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the State, disregarding defendant's evidence to the contrary. *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo.banc 1969); *State v. Allen*, 555 S.W.2d 36, 37[1] (Mo.App.1977); *State v. Williams*, 521 S.W.2d 29[1] (Mo.App. 1975). So synopsized, the evidence is that Bill Miller, an undercover narcotics agent, went to a bar in north Springfield, Missouri, on March 15, 1975. Miller was acting upon police "intelligence" that there was "probably narcotics traffic" at that particular bar. Miller met one Jackie Swearingin at the bar, and the two drank beer and played pool for some time. "[A]pproximately, around 10:00 o'clock," defendant entered the bar, ordered a drink and "came back to the area" where Miller and Swearingin were playing pool. Swearingin took the defendant aside and told defendant Miller "was interested in buying a pound of marijuana." Defendant replied that he had marijuana, but it was "already made up into lids" and he wouldn't sell Miller a full pound. Defendant would, however, sell Miller a "lid" for $15. Defendant further said it would be necessary to obtain the marijuana at his residence. Miller and Swearingin followed the defendant to a house in the east part of Springfield. Miller went in the house and sat on a couch. Defendant went into another room and returned with several "small plastic sandwich-type bags" which contained a "green leafy substance." Miller gave the defendant $20 and received $5 change. Miller placed the bag of "green leafy substance" in his "cowboy-type" boot and later transferred it to an "evidence envelope." Tests performed by a qualified chemist disclosed that the "green leafy substance" was marijuana.

Likewise, it was shown that during the night of March 27–28, 1975, defendant ap-proached Miller as Miller was leaving a bar in north Springfield and asked Miller if he was interested in buying some "speed." Miller asked the defendant "how much he was wanting" for the "speed." Defendant replied that he had a "hundred lot" which he would sell for $25. Miller agreed to pay $25 "for the hundred lot." Defendant suggested that he and Miller return to the bar and "drink a beer." They did so, "possibly . . . played a game of pool," and left the bar about 1:30 or 2:00 a. m. Miller and defendant then drove to defendant's residence. Defendant went in the house. He returned in about "fifteen, twenty minutes." After some further driving around with companions, all of which was described in detail, defendant delivered a "clear, cellophane wrapper . . . with several white tablets in it," identifying the tablets as the "speed" he had offered to sell. Miller paid the defendant $25. Miller put the tablets in an envelope. The tablets were later identified by a chemist as a "water-soluble" salt of amphetamine.

■ The Controlled Substances Act in effect in March, 1975, Chapter 195, RSMo Supp.1973, defined a "sale" as including any barter, exchange, or gift, or offer therefor, and each such transaction made by any person, whether as principal, proprietor, agent, servant or employee. § 195.010(30) RSMo Supp.1973. The evidence establishes that defendant exchanged a small container of a green, leafy substance for $15 during the night of March 15–16, 1975. Defendant also exchanged a clear, cellophane wrapper containing white tablets for $25 during the night of March 27–28, 1975. Two sales were thus established. The green, leafy material was identified as marijuana. By simple resort to the statute, § 195.-017(2)(4)(j), we determine that marijuana was then a Schedule I controlled substance. Because it has been judicially determined, we know that all amphetamines have been classified as Schedule II controlled substances since 1973. *State v. Winters*, 525 S.W.2d 417, 421[1] (Mo.App.1975). The quantity of marijuana sold was not shown, but § 195.200(1)(1)(c) RSMo Supp.1973

which reduced delivery of less than 25 grams of marijuana for no remuneration to a misdemeanor could not apply here; defendant took cash. Agent Miller was shown to be 25 years of age. § 195.-200(1)(4) RSMo Supp.1973 with the exception noted, denounced sales of Schedule I and II controlled substances to persons over 21 years of age as felonies punishable by imprisonment for a term of not less than five years nor more than life imprisonment. In short, the State charged, and proved two sales of controlled substances within the meaning of § 195.200(1)(4) RSMo Supp.1973. We have neither overlooked nor ignored defendant's argument that a jury might have found the defendant not guilty if it had chosen to believe his witnesses rather than Agent Miller, but in our view the only real issue upon defendant's guilt vel non was one of credibility and the testimony of Agent Miller and the police chemist were sufficient to sustain the verdict. *United States v. Martin*, 526 F.2d 485, 486[1] (10th Cir. 1975).

Defendant's second allegation of error is that he was effectively deprived of his Sixth Amendment right to have compulsory process for obtaining witnesses in his favor because two witnesses he proposed to call were intimidated when police officers took their photographs while they were waiting to testify. Defendant relies, as we understand him, upon the proposition that intimidation of defense witnesses by an officer of the court denies a criminal defendant due process. *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *United States v. Morrison*, 535 F.2d 223, 226–228 (3d Cir. 1976); Westen, The Compulsory Process Clause, 73 Mich.L.Rev. 71, 139–141 (1974).

The point, though conscientiously presented, is considerably overstated. During the trial, defendant's counsel asked to present a matter to the court out of the jury's hearing. A police officer was called and testified that under orders from his superior officer, he had been "taking pictures" in the corridors of the Greene County Courthouse. The officer's orders were " . . . to take pictures of subjects in the courtroom [sic] that was intimidating witnesses from the narcotics bureau." In response to questions by the trial court, the officer testified: that he did not know the names of any of the persons whom he photographed; that he did not speak to any of the persons whose picture he took; that he did not identify himself as a police officer and that neither he nor any person in his presence made any statement to anyone while the photographs were being made. The officer gave it as his opinion that his supervisor, a narcotics agent who was present when the pictures were taken, might have been recognized by some of the persons who were photographed.

The defendant, again out of the jury's hearing, presented two witnesses who claimed to have been chilled by the police photography. One was Charles Ernest Johnson, who had been photographed by "[a] man in a blue denim suit, a goatee and sideburns." Mr. Johnson felt " . . . that if they're having my photographs distributed amongst theirselves . . . they're going to give me some undue harassment that I don't really need." Johnson felt he could not testify, having been photographed. He had come prepared to impeach Agent Miller's evidence by testifying that he had seen Miller use controlled substances and that he had seen Miller become intoxicated.

Sammy Jiminez, who had also been subpoenaed for the defense, also felt chilled by having his picture taken. Jiminez, like Johnson, knew nothing of the facts of the instant case; he was prepared to impeach Agent Miller.

The cases cited and relied on by the defendant are so radically different from the situation at hand as to be factually inapposite. In *Webb*, supra, the trial judge admonished the sole defense witness that he was under no obligation to testify and that anything the witness testified to might be used against him. The court went further, and implied that he expected the witness to lie, and if the witness did, he, the trial judge, would "personally see that your case

goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted." No other witness was so admonished. In *United States v. Morrison*, supra, a controlled substance prosecution, defendant's girl friend and sole defense witness, was on three occasions warned by the Assistant United States Attorney through defense counsel that she was liable to prosecution on drug charges if she testified, that her testimony could be used against her and that as she was 18 years of age, she could be prosecuted for perjury. Not content with that, the Assistant United States Attorney called the sole defense witness into his office and in the presence of undercover agents, again impressed upon her the dangers of testifying. *United States v. Smith*, 156 U.S.App. D.C. 66, 478 F.2d 976 (1973), also relied on by the defendant, was a murder prosecution. There, witness Twitty would have testified that the defendant was acting in self-defense. Witness Twitty testified on oath that the Assistant United States Attorney had told him that if he, Twitty, testified, he would be charged with carrying a deadly weapon, obstruction of justice, and as a principal in a murder. The Court of Appeals held such intimidation required reversal. *United States v. Smith*, supra, 478 F.2d at 979[1–3].

■ We do not regard taking photographs at random as inherently threatening behavior. Cf. *Sckorhod v. Stafford*, 550 S.W.2d 799, 802–803[1–3] (Mo.App.1977). Certainly there was no threat here to initiate prosecution if the witnesses testified. In addition, we note that in every case cited by the defendant, the chilled witness had something substantive to offer; in each case, the threatened witness would have offered some order of exculpatory testimony. Johnson and Jiminez knew nothing of the crime charged; their function was to discredit Agent Miller, and defendant had at least three other witnesses who testified that Miller (a) smoked marijuana; (b) smoked opium; and (c) often drank intoxicants on duty. Further, we should note, there was evidence that the photographs were taken in an effort to detect criminal

activity, i. e., tampering with prosecution witnesses. The trial court might reasonably have found the photographs were taken in an effort to detect crime. In the record circumstances, defendant's point is without merit.

A further complaint made by the defendant is that the trial court admitted hearsay and irrelevant testimony to his prejudice. The hearsay of which he complains was elicited from Agent Miller upon direct examination by the State. Agent Miller was in the process of describing his initial contact with the defendant on the night of March 15–16, 1975. As noted, Miller testified that he and one Swearingin were playing pool and drinking beer in a bar when defendant entered the bar. Over defendant's objection, Miller was permitted to testify that Swearingin and defendant stepped aside, and Swearingin " . . . told [defendant] that [Miller] was interested in buying a pound of marijuana." Defendant now claims that the admission of this testimony was so prejudicial he should be granted a new trial.

■ We cannot agree. The hearsay rule is subject to a number of exceptions. Utterance offered to prove the state of mind which ensued in another person is admissible when relevant as against the objection it is hearsay, because it is obvious that no assertive or testimonial use is sought to be made of the utterance. 6 H. Wigmore, Evidence, § 1789, p. 314 (Chadbourn Rev.1976). Mr. Swearingin's utterance was expressly offered by the State to show the defendant's reply, which was, that defendant had marijuana but " . . . it was already made up into lids and [defendant] wouldn't sell [Miller] a full pound."

In other words, Swearingin's utterance provoked a reply indicating defendant's willingness to traffic in drugs. Put differently, it was properly received as "background" explaining Agent Miller's subsequent activity. See *State v. Bright*, 269 S.W.2d 615, 623[11] (Mo.1954).

■ In connection with this point, defendant complains of the trial court's fail-

ure to declare a mistrial because Agent Miller, on redirect, stated that he liked his employment "because I've seen a lot of people's lives ruined from [sic] narcotics." The point is strained and tenuous. Defense counsel made a determined effort to discredit or impeach Agent Miller's testimony, upon which the State's case rested. The possible prejudicial effect of Miller's volunteered remark, which the jury was instructed to disregard, was minimal. This complaint is without merit.

Finally, the defendant complains of instructional error. Count I of the information charged defendant with a wilful sale of marijuana. Instruction No. 5 was the State's main, or verdict-directing instruction upon Count I. Instruction No. 5 directed a verdict of guilty as to Count I if the jury found and believed beyond a reasonable doubt that (a) on or about March 15, 1975, defendant sold a drug known as marijuana in Greene County, Missouri, and (b) that the defendant was aware of the character of the drug and intentionally and knowingly sold it. The instruction, generally, is a rescript of MAI–CR 14.10; no complaint is made as to the form of the instruction, and we find none. The complaint of Instruction No. 5 is that it was improperly given because the envelope containing the marijuana was not opened by the police chemist when he testified, there was no testimony identifying State's Exhibit 1 as marijuana, and neither the court nor the jury inspected the contents of State's Exhibit 1.

█ The defendant's point is not altogether clear to us. Agent Miller testified directly and unequivocally that State's Exhibit 1 contained the "green leafy substance" which he purchased from defendant; the chain of custody was carefully, even meticulously established. The police chemist testified that he opened the envelope, weighed the contents and made several tests to determine what was in the envelope. The chemist concluded the envelope contained marijuana. In view of the fact that the chain of custody of State's Exhibit 1 was carefully traced and bearing

in mind that an expert testified that it contained marijuana, it was not essential to the State's case that the contents of the envelope be produced in court nor was it necessary that the "green leafy substance" be examined by the jury. *People v. Fernandez*, 131 Cal.App.2d 565, 280 P.2d 808, 809[1, 2] (1955); *State v. Dunn*, 155 Mont. 319, 472 P.2d 288, 296–298[13] (1970); *State v. Pipkin*, 101 N.J.Super. 598, 245 A.2d 72, 74–75[1, 2] (1968). See also *Slettvet v. State*, 258 Ind. 312, 280 N.E.2d 806, 808–809[3, 4] (1972).

The defendant advances a similar claim of error with respect to Instruction 7. Instruction No. 7 was a rescript of MAI–CR 14.10 submitting the sale of "salt of amphetamine" by defendant on or about March 28, 1975, in Greene County. The defendant's claim of error is that the controlled substance should have been produced in court and identified by the jury. As was the case with the marijuana, the chain of custody of Exhibit 2, an envelope similar to Exhibit 1, was carefully traced. The contents were identified by an expert chemist. Production of the tablets was not essential to the State's case.

We find no prejudicial error; accordingly, the judgment is in all respects affirmed.

ALL CONCUR.