[Cite as *State v. Saltis*, 2025-Ohio-2286.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 24CA012155 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| GEORGE SALTIS | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 22CR106392 |

DECISION AND JOURNAL ENTRY

Dated: June 30, 2025

FLAGG LANZINGER, Presiding Judge.

{¶1}   George Saltis appeals from the judgment of the Lorain County Court of Common Pleas that denied his motion for a mistrial.  For the following reasons, this Court affirms.

I.

{¶2}   A grand jury indicted Saltis on one count of felonious assault in violation of R.C. 2903.11(A)(2) and one count of aggravated menacing in violation of R.C. 2903.21(A).  The count of felonious assault contained a firearm specification, as well as a forfeiture specification for the firearm used during the commission of the offense.  The charges were based on allegations that Saltis threatened to kill T.H. and hit T.H. on the back of the head with a gun.  Saltis pleaded not guilty and the matter proceeded to a jury trial.

{¶3}   Relevant to this appeal, the State subpoenaed Saltis's friend, A.M., to testify at trial. According to the State, A.M. told the police on the day of the incident that he saw Saltis hit T.H. on the back of the head with his (Saltis's) gun.  A.M. also told the police that he took the gun from

Saltis during the altercation and that he left the scene with it. A.M. later provided the gun to the police.

{¶4} On the morning of the start of trial, the State learned that A.M. intended to testify that he did not see Saltis with a gun. Consequently, the State informed the trial court prior to the start of trial that it no longer intended to call A.M. as a witness. The State also informed the trial court that A.M. would need "Mirandizing" if A.M. testified for the defense. Defense counsel then indicated that he subpoenaed A.M. as a witness for the defense. No further discussions occurred on the record at that time regarding the issue of "Mirandizing" A.M.

{¶5} The State then presented testimony from three witnesses: T.H. (the alleged victim), J.S. (Saltis's nephew), and an officer with the Lorain Police Department. T.H. testified that he was dating Saltis's niece and that he bought a car from Saltis's friend, A.M. According to T.H., he and A.M. were discussing T.H.'s late car payments on the back porch of his girlfriend's parents' house (i.e., Saltis's brother and sister-in-law's house) when Saltis approached him, threatened to kill him, and hit him on the back of his head with a gun. J.S. testified that he saw Saltis hit T.H. with a gun. J.S. also testified that he grabbed Saltis, told T.H. to run, and told A.M. to grab the gun from Saltis. Saltis left the scene. According to the State, A.M. left the scene with Saltis's gun. T.H. and J.S. then called the police.

{¶6} An officer with the Lorain Police Department testified that he responded to the scene and spoke with J.S. and T.H. While he was there, T.H. called A.M. and told A.M. to return to the scene. A.M. complied.

{¶7} The officer testified as to what J.S. and T.H. told him at the scene, which was consistent with their testimonies at trial. Regarding A.M., the officer testified that A.M. told him that his conversation with T.H. about the late car payments was civil and that he was not sure why

Saltis became so upset. The officer testified that A.M. told him J.S. grabbed Saltis and that he (A.M.) grabbed the gun from Saltis and left the scene with it. The officer also testified that A.M. told him the gun was at his house, so he and another officer followed A.M. to his house and retrieved the gun.

{¶8} The officer further testified that A.M. called Saltis while at the scene and that he (the officer) spoke with Saltis over the phone. According to the officer, Saltis "readily admitted that he was armed and pulled his gun and he hit [T.H.]." The officer testified that he observed a red mark on T.H.'s neck, which was consistent with being hit.

{¶9} The State rested and defense counsel moved for dismissal under Crim.R. 29. The trial court denied the Rule 29 motion and then addressed the issue of "Mirandizing" A.M.

{¶10} At that time, the State and defense counsel had a discussion with the trial court outside the presence of the jury. The State and defense counsel informed the trial court that a prosecutor, defense counsel, and an investigator with the prosecutor's office met with A.M. that morning before the start of trial. During the meeting, A.M. began making statements that contradicted his prior statements to the police, including that he did not see Saltis with a gun. According to the State, this came as a surprise to the prosecutor. The State told the trial court that the prosecutor advised A.M. that she only wanted A.M.'s version of the events up until a certain point because the prosecutor recognized that A.M. might incriminate himself. The prosecutor then "advised [A.M.] that there [was] a potential to Mirandize" him. The State explained to the trial court that A.M. could face criminal charges for tampering with evidence and perjury if A.M. testified at trial.

{¶11} A review of this portion of the transcript indicates that it was unclear whether the prosecutor told A.M. during the meeting that he could face criminal charges or whether the State

was simply informing the trial court of the prosecutor's reasoning for advising A.M. that he could be "Mirandized." In a later discussion, the State clarified that the prosecutor never told A.M. he could face criminal charges. Instead, the prosecutor simply told A.M. he may need to be "Mirandized" if he testified at trial.

{¶12} The State and defense counsel then informed the trial court that A.M. asked them if he needed a lawyer and that they informed him they could not offer him legal advice. Defense counsel advised the trial court that it still intended to call A.M. as a witness.

{¶13} The trial court stated that it found it "inappropriate" that the State was now considering a tampering charge based upon conduct it had known throughout the case (i.e., that A.M. left the scene with Saltis's gun) because A.M. would no longer provide testimony favorable to the State. The trial court explained:

> I find it somewhat inappropriate for the State to now have a witness they don't like the testimony of, potentially, that you believe may now testify to and threaten this person with charges, and the State walked him into having to invoke his 5th Amendment Rights. Because now what you have done, is take away the opportunity of the Defense to call this witness, if I find they can appropriately invoke his 5th Amendment Rights . . . .

Throughout the above discussion, it appears the trial court was under the impression the prosecutor told A.M. he could face criminal charges. As noted, the State later clarified that the prosecutor never told A.M. that he could face criminal charges.

{¶14} The trial court then brought A.M. into the courtroom and questioned him. A.M. stated he was told he could be "Mirandized" and that he was not sure if he needed a lawyer. A.M. stated he intended to invoke his Fifth Amendment right because he did not "know if there is anything that w[ould] incriminate [him] or not . . . ." When the trial court asked A.M. how he wanted to proceed, A.M. responded: "I need to ask for counsel, invoke my 5th Amendment." The trial court informed A.M. it would appoint him an attorney and recessed until the next day.

{¶15} The following day, a supervising prosecutor told the trial court that she believed the prosecutor in the meeting with A.M. was "acting with extreme caution" when she "advised him that he may be Mirandized upon coming into the courtroom . . . ." Defense counsel explained that he believed the meeting with A.M. had a "chilling effect once it was discussed that he would be Mirandized[,]" which resulted in A.M. invoking his Fifth Amendment right. Defense counsel opined that A.M. may have misinterpreted "being Mirandized" to mean that he could be arrested. Defense counsel then moved for a mistrial based upon an alleged violation of Saltis's right to compulsory process. The trial court indicated it would not rule on the motion for mistrial at that time and recessed until the following day.

{¶16} The following day, A.M. appeared in court with appointed counsel outside the presence of the jury. A.M.'s counsel indicated that A.M. intended to invoke his Fifth Amendment right. The trial court asked A.M.'s counsel for the basis of A.M.'s invocation of his Fifth Amendment right. A.M.'s counsel responded that it was "clearly laid out in Discovery" that the State could possibly charge A.M. with tampering with evidence, so he advised A.M. to invoke his Fifth Amendment right and not testify at trial. The trial court found that a basis existed for A.M. to invoke his Fifth Amendment right.

{¶17} The trial court then revisited defense counsel's motion for a mistrial with counsel. Defense counsel and the State again summarized the meeting they had with A.M. and the State clarified a few issues. Particularly, the State clarified that the prosecutor never told A.M. he was facing criminal charges. The State explained that the prosector simply told A.M. he may need to be "Mirandized" if he testified at trial. The State also stated that A.M. asked if he was being arrested and the prosecutor told him that he was not being arrested. Defense counsel did not dispute the State's assertions in this regard. According to defense counsel, A.M. may have

interpreted the prosecutor's reference to being "Mirandized" as potentially being arrested. Defense counsel again argued that the meeting had a "chilling" effect on A.M.'s decision to testify at trial. The trial court reserved ruling on defense counsel's motion for a mistrial and proceeded with trial.

{¶18} Saltis then testified as the only witness for the defense. According to Saltis, T.H. pushed him so Saltis "hauled off and slugged" him in the neck. Saltis testified that he did not have a gun on him and that the officer, T.H., and J.S. all lied during their testimonies.

{¶19} After defense counsel rested, the trial court overruled defense counsel's motion for a mistrial. The trial court explained:

> After carefully considering the events that occurred and the conduct of the State, and I have gone through a number of scenarios and I believe even if [A.M.] had taken the stand, it would have been an issue that was raised regarding his 5th Amendment, probably more proper that this occurred on the stand than a sidebar, that likely the result would have been that [A.M.] would not have testified.

{¶20} The jury found Saltis guilty of the charged offenses and related specifications. About a week later, the trial court issued its written decision on the motion. In it, the trial court explained the various discussions it had with the State and defense counsel regarding the issue. In doing so, the trial court acknowledged that it initially thought the State explicitly threatened A.M. with criminal charges at the meeting on the morning of the start of trial. The trial court acknowledged that the State later clarified that the prosecutor never told A.M. he was facing criminal charges. Instead, the prosecutor simply cautioned A.M. that he may need to be "Mirandized." The trial court explained:

> The Court was inclined to believe that the ultimate version of events was that the prosecutor delicately attempted to navigate murky waters knowing that there was a potential for [A.M.] to incriminate himself, and unfortunately based upon the circumstances in the interview and terminology used to caution [A.M.], he was left with the impression he needed an attorney to avoid being arrested.

The trial court then found that the prosecutor's actions did not prejudicially affect the merits of the case or Saltis's substantial rights. In reaching this conclusion, the trial court relied, in part, upon the Ohio Supreme Court's decision in *State v. Schaub*, 46 Ohio St.2d (1976).

**{¶21}** The trial court later sentenced Saltis to an aggregate prison term of seven to nine years, which included a three-year mandatory prison term for the firearm specification. The trial court also ordered the forfeiture of the gun used in the offense. Saltis now appeals, raising one assignment of error for this Court's review.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED DENYING APPELLANT'S MOTION FOR A MISTRIAL WHEN IT FOUND THAT A PROSECUTOR'S WARNING TO A WITNESS WAS A THREAT CALCULATED TO TRANSFORM A WILLING DEFENSE WITNESS TO ONE WHO WOULD NOT TESTIFY IN VIOLATION OF APPELLANT'S SIXTH AMENDMENT RIGHT TO COMPULSORY PROCESS[.]

**{¶22}** In his sole assignment of error, Saltis argues that the trial court erred by denying his motion for a mistrial. More specifically, Saltis argues that the trial court erred by denying his motion for a mistrial because the prosecutor's conduct in telling A.M. he could be "Mirandized" if he testified at trial was tantamount to a threat, which caused A.M. not to testify and denied him of his Sixth Amendment right to compulsory process. For the following reasons, this Court disagrees.

**{¶23}** "We recognize that the trial judge is in the best position to determine whether the declaration of a mistrial is warranted under the circumstances as they have arisen in the courtroom." *State v. Edwards*, 2017-Ohio-7231, ¶ 12 (9th Dist.). Accordingly, this "Court reviews the trial court's denial of a motion for a mistrial for an abuse of discretion." *State v. Flowers*, 2012-Ohio-3783, ¶ 32 (9th Dist.). An abuse of discretion is more than an error of judgment; it means the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v.*

*Blakemore*, 5 Ohio St.3d 217, 219 (1983).  When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court.  *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶24}  "Granting a motion for a mistrial is appropriate when the defendant's right to a fair trial is no longer possible."  *Flowers* at ¶ 32.  "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused are adversely affected."  *Edwards* at ¶ 13, quoting *State v. Howes*, 2010-Ohio-421, ¶ 11 (9th Dist.).  "In determining whether a defendant was deprived of a fair trial, a court must determine whether, absent the error or irregularity, 'the jury would have found the appellant guilty beyond a reasonable doubt.'"  *Edwards* at ¶ 13, quoting *Columbus v. Aleshire*, 2010-Ohio-2773, ¶ 42 (10th Dist.).

{¶25}  Regarding the right to compulsory process, "[t]he Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution preserve to an accused the right to present witnesses in his defense and to compel their attendance at trial."  *State v. Jackson*, 2018-Ohio-1633, ¶ 17 (8th Dist.).  "This right 'is in plain terms the right to present a defense' and is 'a fundamental element of due process of law.'"  *State v. McIntosh*, 2003-Ohio-3824, ¶ 17 (1st Dist.), quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "Accordingly, 'governmental impairment of the accused's ability to call witnesses on his behalf cannot be tolerated.'"  *Jackson* at ¶ 18, quoting *United States v. Bell*, 506 F.2d 207, 222 (D.C. Cir. 1974).

{¶26}  While the State cannot threaten a witness with prosecution to discourage the witness from testifying for the defense,  "no constitutional violation occurs . . . [w]here the prosecutor simply provides the witness with a truthful warning . . . ."  *United States v. Jackson*, 935 F.2d 832, 847 (7th Cir. 1991); *see Webb v. Texas*, 409 U.S. 95, 97 (1972).  "In fact, the government has an obligation to warn unrepresented witnesses of the risk that the testimony they

are going to give can be used against them." *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995). "Where, however, the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *Id.*, quoting *Jackson* at 847.

**{¶27}** Here, Saltis argues that the trial court erred by denying his motion for a mistrial because the prosecutor's conduct in telling A.M. he could be "Mirandized" if he testified at trial was tantamount to a threat, which caused A.M. not to testify and denied him of his Sixth Amendment right to compulsory process. According to Saltis, the prosecutor's conduct was menacing, intimidating, and calculated to "transform [A.M.] from a willing witness to one who would refuse to testify." Saltis argues that the Ohio Supreme Court's decision in *Schaub*, which the trial court relied upon in its written decision, "fails to fully state the law" and that the trial court's reliance upon it was misplaced. Saltis argues at length that this case is akin to *United States v. Smith*, 478 F.2d 976 (D.C. Cir. 1973), which the *Schaub* Court found distinguishable, and that the application of *Smith* requires this Court to reverse the decision of the trial court. This Court disagrees.

**{¶28}** In *Schaub*, the defendant was accused of shooting a police officer at a bar. *Schaub*, 46 Ohio St.2d at 26. After the State rested, the defense called a man who was with the defendant at the time of the shooting. *Id.* The witness explained that he knew the defendant and had been with him the evening before the shooting. *Id.* The State interrupted the witness's testimony and told the trial court "that he had discussed with [the witness] his participation in the events of the night preceding, and those of the morning of the shooting, and felt that the court should advise him of his rights, as his testimony could involve him in 'some acts of unlawfulness under our present statutes.'" *Id.* According to the witness, the prosecutor "didn't say he didn't want me to testify;

he said it was something or another that I didn't have to testify, or something like that." *Id.* at 28. The trial court appointed the witness counsel, after which the witness invoked his Fifth Amendment right and refused to testify. *Id.* at 26.

{¶29} On appeal, the Ohio Supreme Court addressed:

> whether the actions of trial counsel for the state in informing the defense witness of his Fifth Amendment right to remain silent, calling the court's attention to possible difficulties with the defendant's testimony, and the trial court's subsequent rulings thereon, were prejudicial to the defendant's rights under the Sixth Amendment and Section 10, Article I, Ohio Constitution, to obtain witnesses in his favor.

*Id.* at 27. The Court found that the trial court and prosecutor's actions were neither improper nor prejudicial. *Id.* at 28. In doing so, the Court distinguished the underlying facts from *Smith*, which "involved a similar fact situation." As noted, Saltis argues that this case is more akin to *Smith* than *Schaub*.

{¶30} In *Smith*, the defendant was accused of shooting and killing a man. *Smith*, 478 F.2d at 977. The defense planned to call a witness who saw the shooting and would support the defense's theory that the defendant acted in self-defense when he shot the victim. *Id.* at 979. Prior to the witness's testimony, the prosecutor approached the witness outside of the courtroom and told the witness he "[w]ould be" prosecuted for his involvement in the underlying shooting if he took the stand. *Id.* at 977, 978. After defense counsel brought this to the attention of the trial court, the trial court appointed the witness counsel. The witness invoked his Fifth Amendment right and did not testify on behalf of the defense. *Id.* at 978. The jury ultimately found the defendant guilty of murder and carrying a dangerous weapon. *Id.* at 977.

{¶31} On appeal, the D.C. Circuit Court of Appeals determined that the prosecutor's "warning was plainly a threat that resulted in depriving" the defendant of testimony that was "vital to the defense . . . ." *Id.* at 979. The Court explained:

> Even if the prosecutor's motives were impeccable, however, the implication of what he said was calculated to transform [the witness] from a willing witness to one who would refuse to testify, and that in fact was the result. We therefore conclude that the prosecutor's remarks were prejudicial.

*Id.* As a result, the Court reversed the defendant's convictions. *Id.*

{¶32} The Ohio Supreme Court in *Schaub* found the facts in *Smith* distinguishable on the basis that the prosecutor in *Smith* threatened the witness with prosecution. *Schaub*, 46 Ohio St.2d at 28. The Court found that "no such 'threat'" was involved in *Schaub*. *Id.*

{¶33} Having reviewed the record, this Court concludes that this case is akin to the Ohio Supreme Court's decision in *Schaub*, not the D.C. Circuit Court of Appeals' decision in *Smith*, and that the trial court did not err when it denied Saltis's motion for a mistrial. The record reflects that the prosecutor did not anticipate A.M. providing a different version of the events on the morning of the start of trial. When A.M. began to make potentially incriminating statements, the prosecutor cautiously warned A.M. that he could be "Mirandized" if he took the stand. While being "Mirandized" most commonly refers to advising an individual of his or her constitutional rights in the context of a custodial interrogation, the prosecutor in this case appears to have used the term to generally refer to A.M.'s constitutional rights against self-incrimination. *See Dickerson v. United States*, 530 U.S. 428, 435 (2000) (acknowledging the colloquial use of "*Miranda* rights[.]").

{¶34} Although Saltis characterizes the prosecutor's conduct as menacing, intimidating, and threatening, the record does not support this characterization. Instead, the record reflects that the prosecutor simply provided A.M. with a truthful warning that was not "over and above what the record indicate[d was] necessary[] and appropriate . . . ." *Pierce*, 62 F.3d at 832 (6th Cir. 1995), quoting *Jackson*, 935 F.2d at 847 (7th Cir. 1991); compare *Webb*, 409 U.S. 95 (1972). In short, like *Schaub*, "no such 'threat'" was involved in this case. *Schaub*, 46 Ohio St.2d at 28. Because Saltis based his motion for a mistrial on the premise that the prosecutor's conduct

deprived him of his right to compulsory process, it follows that the trial court did not err by denying the motion.

{¶35} Moreover, the record reflects that the trial court appointed A.M. counsel after the State and defense counsel brought this issue to the trial court's attention. After conferring with counsel, A.M. invoked his Fifth Amendment right and decided not to testify at trial. The trial court ultimately found that, even if the prosecutor had not cautioned A.M. prior to trial that he could be "Mirandized," the issue would have presented itself at trial with the likely result that A.M. would not have testified. The trial court then found that the prosecutor's actions did not prejudicially affect the merits of the case or Saltis's substantial rights. This Court agrees.

{¶36} Based upon the foregoing, this Court concludes that the trial court did not err when it denied Saltis's motion for mistrial. Accordingly, Saltis's assignment of error is overruled.

III.

{¶37} Saltis's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

⸺

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period

for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JILL FLAGG LANZINGER
FOR THE COURT

HENSAL, J.
STEVENSON, J.
CONCUR.

APPEARANCES:

JOHN F. CORRIGAN, Attorney at Law, for Appellant.

ANTHONY CILLO, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.