**UNITED STATES of America**

**v.**

**Dexter Andre DAVIS, a/k/a Winston Richards, Appellant.**

**No. 91–3046.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1992.

Decided Sept. 8, 1992.

As Amended Oct. 28, 1992.

Rehearing and Rehearing En Banc Denied Dec. 3, 1992.

Allen H. Orenberg, Washington, D.C. (appointed by the Court), for appellant.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Wendy Wysong, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In late 1989, Dexter Davis ("Davis" or "appellant") was indicted for the unlawful possession of, and intent to distribute, cocaine. 21 U.S.C. § 841(a). Davis initially pled guilty but, later, withdrew the plea. His first trial ended in a hung jury, but a second trial was held and concluded with a guilty verdict.

On appeal, Davis presses four arguments; each of these, he charges, compels the reversal of his conviction. First, he contends that he was effectively denied the right to testify on his own behalf because the prosecutor threatened a perjury charge should he do so. Second, he suggests that the trial court abused its discretion in responding to a jury question by reading certain excerpts of trial testimony. Third, he submits that—even if the court was empowered to read these excerpts—it erred in the process of doing so. Finally, he insists that the evidence adduced at trial was simply insufficient to justify a guilty verdict.

For reasons explored below, we reject these arguments and sustain appellant's conviction.

I.

On the evening of October 13, 1989, two plainclothes Metropolitan Police Department investigators—Edward Howard and Annie Stewart—visited the East Gate Projects located at the 600 block of 50th Street, Southeast Washington, D.C. Howard had suggested a trip to this spot as he apparently knew from previous investigations that drugs could be purchased there. When the detectives arrived, an individual who later was identified as "BJ" approached and asked if they were "looking." When Howard replied "yes," BJ inquired as to what they wanted; Howard answered "a fifty"—meaning a $50 rock of cocaine. BJ lead them down a walkway while jumping up and down and saying that he was going to take them where the best cocaine could be found. At this point, someone on a nearby hill seemingly recognized Howard and yelled to BJ; BJ told the person on the hill to wait as he would soon return. BJ continued to lead the detectives up the walkway, eventually approaching a group of three people standing around appellant. Appellant was himself holding a plastic bag and handing out things contained within it. Next to him was another person taking money from the three gathered visitors.

When Howard was two to three feet away from appellant, the person on the hill shouted "Police" and quickly everyone scattered. Howard testified that he saw appellant take a few steps, drop the plastic bag, and walk away. Howard then identified himself as a police officer, apprehended appellant, placed him under arrest, and recovered the fallen plastic bag. When appellant was stopped, he was about three feet away from the plastic bag; Howard was himself a foot or two from it. A field test on the contents of the dropped plastic bag confirmed the presence of approximately 83 grams of cocaine-base.

At the second trial, the government presented the testimony of Howard and Stewart, as well as that of a narcotics expert who explained, among other things, the roles of a money holder, runner, and stash man in a drug deal. He testified that a runner will attract buyers much like a salesman, that the stash man is the individual who holds the drugs, and that a third person sometimes handles the money as it comes in.

Before the defense opened its case, Davis asked the court to prohibit the government

from using a presentence report prepared as a result of his initial guilty plea. In that report, appellant had stated that he was in the area to purchase cocaine and that he supported himself through the sale of drugs. The trial judge granted the request, explaining that if the probation report had been an impediment to appellant testifying in his own behalf, it "is no longer an impediment." Tr. III 323.[1] The prosecutor, apparently aware of defense plans to present witnesses who would testify that Davis was innocently present at the East Gate Projects on the evening of the arrest (a position at odds with his statements in the probation report), immediately intervened, asking the court to instruct Davis about the possibilities and penalties of a perjury charge were he to take the stand and lie. The court, while noting that no one has the right to commit perjury, refused to oblige the prosecutor.

The defense went on to offer three live witnesses and the written testimony of a fourth individual hoping to establish that Davis visited the East Gate Projects to join with friends on the way to a movie. The defense also presented testimony indicating that the lighting in the area of the arrest was generally poor, though it was contradicted on this detail by Howard and Stewart who alternatively characterized the lighting as "very good" and "adequate." Davis himself never took the stand. In response to a court inquiry, defense counsel blamed this fact in part on the prosecutor's threats of a perjury prosecution. The court then repeated its earlier instruction that, though it was unable to offer Davis immunity, nothing in connection with the plea would be used at trial.

After the government's rebuttal closing argument, defense counsel informed the trial judge about another warning he had received from the prosecutor: during an earlier break in the trial, the prosecutor "mentioned to me [defense counsel] that if [Davis] took the stand, ... there might be a case of suborning perjury." Tr. III 428. The prosecutor immediately responded by insisting to the trial court that the comment was made "offhandedly" and was not intended as a threat. *Id.* The trial judge reminded defense counsel that he had given Davis "every opportunity" to testify by ruling the presentence report inadmissible; he then proceeded to instruct the jury. *Id.* at 429.

During its deliberations, the jury issued a note asking the District Judge a series of questions; one of these inquired as to how far appellant had been from the drugs at the time of his arrest. Defense counsel asked that the court refrain from answering the query and that it instead instruct the jury to rely on its best recollection. The District Judge, however, recalled that Officer Howard had testified on this point and offered to read the relevant portions to the jury. The jury assented, heard the testimony, and, after retiring for further deliberations, returned with its guilty verdict.

## II.

### A. The Right to Testify and Prosecutorial "Threats".

Davis argues that his constitutional and statutory right to testify as a witness in his own behalf was effectively denied by the prosecutor's repeated threats that a perjury indictment would be forthcoming were he to take—and then lie on—the stand. In approaching this argument, we note at the outset that the accused's right to testify has taken a significant journey in our jurisprudence.

English common law jurists, beginning in at least the sixteenth century, began enforcing an evidentiary rule that rendered any party to a civil lawsuit "incompetent" to testify because of his "interest" in its outcome.[2] Eventually, this prohibition was

---

1. "Tr. II" refers to Volume II of the District Court transcript and relates to events of the second trial occurring on December 4, 1990. "Tr. III" and "Tr. IV" refer to subsequent volumes of the transcript relating to events of the second trial occurring on December 5-6, 1990.

2. *See* 2 WIGMORE, EVIDENCE 799–802 (1979). The rule rendering a party to a civil suit incompetent to testify due to interest is, in fact, perhaps as old as the jury system itself. *Id.*

extended to forbid even the criminal defendant from acting as a witness.[3] The rationale for this rule was, as Gilbert explained, based on the theory that "from the nature of human passions and actions there is more reason to distrust such biased testimony than to believe it." GILBERT, EVIDENCE 119 (ca. 1726).[4] As with so much else of the English common law, this rule found its way across the Atlantic and into many American jurisdictions. *See, e.g., Lukens,* 1 Dall. at 6; *Jones v. State,* 1 Ga. 610 (Ga.1846); *Roberts v. State,* 189 Ga. 36, 40–41, 5 S.E.2d 340, 343 (Ga.1939).

By the middle of the nineteenth century, experience revealed that, while well-intentioned, this ancient and unyielding rule commonly caused severe injustices. Legislative reformers, led by Jeremy Bentham in England and Chief Justice John Appleton of Maine in this country, soon began advocating its abandonment.[5] Their attempts were enormously successful: one fruit of their work is 18 U.S.C. § 3481, a congressional statute enacted in 1878 establishing a presumption in favor of the accused's competence to testify in all federal criminal trials.[6]

In *Rock v. Arkansas,* 483 U.S. 44, 51, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987), the Supreme Court transmogrified the federal statutory right to testify into a constitutional right, effectively taking our law a full one hundred and eighty degrees—from a deep hostility toward the accused's testimony to a fundamental appreciation for it. In explaining the textual basis for the right, the Court in *Rock* indicated that it emanates from a variety of constitutional clauses: the Due Process Clauses of the Fifth and Fourteenth Amendments, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's privilege against self-incrimination. *Id.* at 51–53, 107 S.Ct. at 2709–10. In exploring the Compulsory Process Clause rationale, the Court commented that the Sixth Amendment guarantees the right to call witnesses "material and favorable to [the] defense." *Id.* at 52, 107 S.Ct. at 2709 (quoting *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)).[7] Logically included within this greater power to call *any* material and favorable witness, the Court reasoned, must surely exist the lesser power of calling oneself to the stand. *Rock,* 483 U.S. at 52, 107 S.Ct. at 2709.

Under caselaw predating *Rock,* a variety of prosecutorial and judicial actions aimed at discouraging defense witnesses from testifying had been deemed to deprive the criminal defendant of his Sixth Amendment compulsory process right. *See, e.g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (defense witness effectively driven off witness stand by remarks of trial judge regarding penalties for perjury); *United States v. Morrison,* 535 F.2d 223 (3d Cir.1976) (prosecutor effectively prevented defense witness from testifying by bringing her to his office for an intimidating interview); *United States v. Smith,* 478 F.2d 976 (D.C.Cir.1973) (defense witness told by prosecutor that if he testified as indicated by other testimony, he

---

**3.** The disqualification of the criminal defendant appears to have come much later than that of the civil party, though it was surely in force by the founding of the republic. *See Rex v. Lukens,* 1 Dall. 5, 6, 1 L.Ed. 13 (Pa.1762) (court refused to swear a criminal defendant as a witness).

**4.** Gilbert further explained that "[a]n universal exclusion [of parties as witnesses], where no line short of this could have been drawn, preserves infirmity from a snare, and integrity from suspicion; and keeps the current of evidence, thus far at least, clear and uninfected." GILBERT, EVIDENCE 223 (ca. 1726).

**5.** *See* RATIONALE OF JUDICIAL EVIDENCE, B, ix, pt. iii, c. iii (Bowring, ed.), vol. vii, p. 393. *See also*

GREANLEAF, EVIDENCE 488 (1899); *Ferguson v. Georgia,* 365 U.S. 570, 577, 81 S.Ct. 756, 761, 5 L.Ed.2d 783 (1961).

**6.** 18 U.S.C. § 3481 provides that

[i]n trial of all persons charged with the commission of offenses against the United States ... the person charged shall, at his own request, be a competent witness.

**7.** The Compulsory Process Clause of the Sixth Amendment states that

[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining Witnesses in his favor....

U.S. CONST. amend. VI.

would be prosecuted for carrying a concealed weapon, obstruction of justice, and as an accessory to murder). It seems only sensible given § 3481 and *Rock* that similar prosecutorial or judicial behavior aimed at dissuading the defendant himself—not merely his witnesses—from testifying would surely offend his statutory and constitutional rights.

 That said, the Sixth Amendment is not implicated every time a prosecutor or trial court offers advice regarding the penalties of perjury. *See United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C.Cir. 1982). Indeed, there are circumstances when warnings about the possibility and consequences of a perjury charge are warranted—even prudent. As we stated in *Blackwell:* "It is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely." *Id.* As with his witnesses, so too with the accused himself. His rights are not trenched upon by mere information or advice about the possibility of a perjury prosecution, but by deliberate and badgering threats designed to quash significant testimony.

 Davis here contends that at two points in the trial the prosecutor crossed the line between offering acceptable advice and exerting improper influence. The first came in the discussion of the presentence report. After ruling that he would not allow the report to be used in any fashion during the trial, the District Judge stated that, to the extent it had been "an impediment to putting [Davis] on the stand, that is no longer an impediment." Tr. III 323. The prosecutor then interceded, asking the court to

> instruct the defendant and the defense counsel that while he does have a license—I mean he certainly has a right to get up there and testify. He certainly doesn't have the license to commit perjury. That while I won't be able to impeach him on the stand, we certainly have the right to prosecute him for perjury if he gets up on that stand and lies and we have to prove the statements made to the probation office ... that he

was on that scene not innocently.... And if he says anything on the stand to contradict those statements, there will be a prosecution for perjury under the statute.

Tr. III 328. The trial judge replied that "obviously nobody has the right to perjure themselves," but declined "to give any instruction to the witness other than what I'm sure his lawyer has told him." *Id.*

The second incident occurred during a court recess early in Davis's case. Apparently, the prosecutor approached defense counsel and stated that if he allowed Davis to take the stand, there "might be a case of suborning perjury." Tr. III 428. Defense counsel, oddly, did not bring this incident to the trial court's attention until after closing arguments. When he did, the prosecutor immediately replied that such prosecutions "occur[ ] in cases involving perjury where the defense counsel knows. I mentioned it offhandedly for the defense counsel's consideration." *Id.*

In our view, neither of these prosecutorial statements involve the sort of misconduct described in *Webb, Morrison,* and *Smith.* In *Webb* the trial judge waxed on at great length about the consequences of committing perjury, and did so without any basis in the record to believe that the witness might lie. In fact, he went so far as to say that

> [i]f you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on.

409 U.S. at 96, 93 S.Ct. at 352. Unremarkably, the Supreme Court found those to be "threatening" and improper remarks. *Id.* at 98, 93 S.Ct. at 353–54.

In *Morrison,* the prosecutor sent a defense witness at least three messages warning that, if she testified, she would be liable to prosecution and that her testimony could be used against her. Moreover, he subpoenaed the witness, had her brought

to his office, and admonished her further about the consequences of perjury. 535 F.2d at 225–26. Similarly in *Smith*, an Assistant United States Attorney told a defense witness that if he took the stand and testified in an ongoing murder trial that he "would," as the witness related it, be prosecuted for a weapons charge and as an accessory to the murder. 478 F.2d at 978. This, the prosecutor promised, even if the witness testified truthfully.

 The warnings at issue here differ from the *Webb, Morrison,* and *Smith* warnings not merely in degree, but in kind. They involve no egregious misconduct or baldly threatening behavior. Rather, it is obvious that the prosecutor realized Davis's statements in the presentence report (that he was present to buy drugs, and that he sold drugs to support himself) were in unmistakable contradiction with his defense theory of innocent presence. If Davis testified consistently with his presentence report, he would undermine his defense theory; if he testified in harmony with his defense theory, he would indeed face potential perjury problems. The prosecutor here recognized that defendant had two stories with respect to his criminal involvement and that, therefore, the possibility of perjury was worth discussion. The manner in which the prosecutor raised the issue was also acceptable: there is no intimation that she berated or badgered Davis or his counsel. In sum, the prosecutor acted within acceptable limits; her warnings give rise to no valid statutory or constitutional complaint.[8]

 That said, we wish to note at this juncture the fine work of Judge Sporkin in assuaging any fears appellant might have had arising from the prosecutor's comments. After the first incident, he stated that, though Davis obviously may not perjure himself, "I am not ruling at this time

what will be the effect of [Davis's testimony], and I'm not going to give any instruction to the witness other than what I'm sure that his lawyer has told him." Tr. III 328. Likewise, later in the case, the judge again made clear the impact of his ruling on the admissibility of the presentencing report:

> I think what the Government has said is that if [Davis] ((truth, that's what they would consider [*i.e.* a perjury charge]. Look, the point is I cannot grant any immunity. All I can tell you [is] what my ruling is. I can tell you that, you know, the Government can take any position that they want to take. You know my ruling that everything [regarding the presentence report] has been erased. So that's up—you can make your own decision [about testifying]. I wouldn't worry about what the Government says. I'd worry about what the Court says.
>
> The Court has taken away every barrier that you've raised here to [Davis] testifying, and I have given you a ruling [establishing the inadmissibility of the presentencing report].

Tr. III 387. Finally, after being informed of the off-the-record comment after the government's closing argument, the trial judge commented that

> I have told you in the strongest terms I can I've taken away every roadblock to prevent [Davis] from testifying. I don't know what more I can do. If you want to listen to the prosecutor and don't want to listen to the Judge, that's your problem. But I've given you every opportunity.

Tr. III 428–29.

As these passages demonstrate, the trial court made every effort to instruct Davis that, though it could not grant immunity, no obstacles prevented him from testifying. Any error that might have arisen from the

---

8. The prosecutor's admonition to defense counsel about the possibility of suborning perjury was undoubtedly uncalled for: there is nothing in the record to suggest defense counsel ever considered aiding his client in a lie. Indeed, we hope to make plain that offhanded warnings about potential criminal charges are never part of an acceptable trial strategy. Still, the minimal nature of the comments at issue here, coupled with the fact that veteran defense counsel did not bring the matter to the trial court's attention until much later in the trial, demonstrate that the prosecutor's behavior did not rise to the level of a *Webb, Morrison,* or *Smith* violation.

prosecutor's comments was thus rendered harmless by the court's curative comments. *See Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1966) (while obliged to correct errors affecting the substantial rights of a criminal defendant, appellate courts generally do not intervene to correct purely harmless errors).

### B. *The Decision to Read Testimony*

Appellant next complains that the trial court erred when it answered the jury's question regarding the distance between himself and the drugs by reading a portion of Howard's testimony. His argument on this score appears to devolve into two discrete points. The first grows out of his observation that the jury did not ask for Howard's testimony to be read, but only for an answer to the direct question of how far Davis was from the drugs.[9] It is improper, appellant suggests, for the court to answer such a direct question with the testimony by a government witness; doing so appears to endorse the prosecution's interpretation of the events at issue. Appellant's second argument stems from his belief that the court's selection of just Howard's testimony lent it "undue emphasis."

■ In approaching both of these arguments we must acknowledge initially that the trial judge enjoys wide latitude in determining whether and what testimony should be read to a jury during its deliberations. He is in a better position than we to weigh the benefits of allowing the jury to rehear evidence against the risks associated with having bits and pieces of evidence selectively emphasized. *See, e.g., United States v. DeLuca,* 692 F.2d 1277, 1286 (9th Cir.1982); *United States v. An Article of Drug,* 661 F.2d 742, 746 (9th Cir.1981). Consequently, we review his decisions regarding the reading of testimony only to assure that no abuse of discretion has transpired. *United States v. Mackin,* 502 F.2d 429, 442 (D.C.Cir.), *cert. denied,* 419 U.S. 1052, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974); *United States v. Thornton,* 498 F.2d 749,

753 (D.C.Cir.1974); *Salzman v. United States,* 405 F.2d 358, 360–61 (D.C.Cir.1968).

■ In the case *sub judice* we see no abuse of discretion. To begin, the trial judge did not force Howard's testimony on the jury; indeed, after noting the existence of evidence relevant to their direct question, he instructed the jury to retire and decide "how you want to proceed.... If you believe you have enough information on that matter from you own recollections, fine. If you believe that you would like to hear the testimony, let me know and we can arrange that." Tr. IV 472–73. Only after the jury foreman informed the court that the jury would indeed like to hear Howard's testimony did he then proceed to read it. Tr. IV 475–76.

Moreover, the court did nothing to suggest that Howard's version of events was correct. To the contrary, before reading anything the court reminded the jury of its duty to "consider everybody's testimony" and "to consider every part of th[e] charge and part of that charge included credibility [of witnesses]." Tr. IV 487. After finishing with Howard's testimony, the court again instructed the jury about the need to examine the entire record: "I want to caution you to consider the whole—everything I've given you. Consider all of the testimony." Tr. IV 489.

Finally, there is nothing invidious about the trial court's selection of Howard's testimony for recitation. Appellant suggests to us no other record evidence the trial court should have read in reply to the jury's inquiry. He mentions no relevant cross examination undermining Howard's statement. Simply put, he has given us no reason to believe that revisiting Howard's testimony was in any way prejudicial to his case.

■ Turning to appellant's second point, we find little support for his contention that the court "unduly emphasized" Howard's testimony simply by reading it. We acknowledge several cases appellant cites for the proposition that a trial judge may *deny* a jury request to revisit certain

---

9. The jury asked: "exactly how much distance from the drugs to the defendant?" Tr. IV 467.

testimony when he believes doing so might lend that testimony undue prominence. *See, e.g., United States v. Zarintash,* 736 F.2d 66, 70 (3d Cir.1984); *United States v. Varsalona,* 710 F.2d 418, 420–21 (8th Cir. 1983); *United States v. Nolan,* 700 F.2d 479, 486 (9th Cir.1983); *United States v. Rabb,* 453 F.2d 1012, 1013 (3d Cir.1971). None of these cases, though, suggests that a trial court abuses its discretion—viz. "unduly emphasizes" testimony—when it *grants* a request for the recitation of previously heard testimony.

In fact, the parties before us are able to identify but one case in which a judge has been found to abuse his discretion simply by allowing testimony to be reheard in response to a jury question. That case, *United States v. Binder,* 769 F.2d 595 (9th Cir.1985), is, however, readily distinguishable from ours. In *Binder,* the Ninth Circuit held that replaying videotaped evidence was highly prejudicial because of the special impact video can have, reproducing as it does the expressions of faces and intonations of voices. *Id.* at 600–01. Here, of course, the court merely read from a printed transcript.

Ultimately, whatever emphasis the trial court may have placed on Howard's testimony was well tempered by the cautionary instructions offered both before and after the event. As noted above, the court urged jurors at both points to recall all of the testimony before them and to weigh carefully the credibility of the repeated testimony. Considering these warnings and the utter absence of any relevant authority indicating that the trial court could not reread the requested testimony, we cannot sustain appellant's "undue emphasis" argument.

## C. *The Transcription Error*

■ Appellant further claims that, even if the trial court was empowered to read Howard's testimony, it committed reversible error in the *process* of doing so. He notes that, due to a flawed transcript, the court repeated Howard's testimony as follows:

> Question: When [defendant] was stopped, how far away was he from the bag he had dropped?
>
> Answer: *I would say about a foot to two feet away from him.*
>
> Question: How far away was he from the bag?
>
> Answer: About three feet.

Tr. IV 487–89 (emphasis added). The correct version of Howard's testimony reads as follows:

> Question: When [defendant] was stopped, how far away was he from the bag he had dropped?
>
> Answer: *I'd say I was about a foot to two feet away from it.*
>
> Question: How far away was he from the bag?
>
> Answer: About three feet.

Tr. II 181 (emphasis added). Simply put, the erroneous version places appellant both "one to two feet" and "three feet" away from the drugs, while the correct account has Howard one to two feet from the bag and Davis three feet from it.

■ As appellant acknowledges, coming as it does unaccompanied by a contemporaneous objection to the District Court, we can review this mistake only under a plain error standard of review. Fed. R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). For an appellate court to overturn a conviction under this standard, the error complained of must meet at least three requirements: it must be a plain one (*i.e.* so obvious that the judge should have recognized it on his own); it must affect the substantial rights of parties (*i.e.* it cannot be merely harmless); finally, it must be one that " 'seriously affects the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). The reason underlying this last requisite was explained in *United States v. Frady:* any further extension of the plain error rule would skew the balance between

"our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982) (footnote omitted).

We think that the error appellant points to cannot satisfy any of these standards. To begin, as a subtle mistake in transcription—not as a major misstatement of fact or as an erroneous legal argument—the error before us hardly falls into the class of errors so "plain" or "obvious" that we can charge the District Judge with the duty of noticing it.

Moreover, flowing from this error we see no prejudice accruing to appellant nor any injustice affecting the integrity of our judicial system. Though the absence of a prompt objection cannot negate the possibility of prejudice, the fact that counsel heard the incorrect testimony repeated no less than three times without noticing the error must surely be some evidence of its harmlessness. Put simply: we are at a loss to understand why it would be prejudicial for a jury to hear the erroneous testimony but once when trained attorneys failed to detect the problem even after three full repetitions—two when the government, counsel, and District Judge were attempting to decide which portions of Howard's testimony should be read; the third in the presence of the jury. Tr. IV 483–85.

 In any event, a claim of prejudice cannot be sustained without a view to the full record. *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985). Here, the difference between appellant standing "one to two feet" or "three feet" away from the drugs strikes us as insignificant given its context. Howard was indisputedly in close range of both the drugs and appellant. He stated that he saw appellant drop and then promptly retrieved the bag. Stewart, who saw appellant holding the bag prior to his arrest, confirmed that it was the same bag Howard had recovered. Given this setting, we cannot hold that a transcription error suggesting a difference of but a foot or two in distance works a prejudicial harm upon appellant's substantial rights.

### D. *Sufficiency of the Evidence*

 Appellant closes by suggesting that the evidence adduced at trial was simply insufficient to convict him for possessing cocaine with the intent to distribute. As we stated in *United States v. Sutton,* 801 F.2d 1346, 1358 (D.C.Cir.1986), when reviewing challenges to the sufficiency of the evidence in a criminal appeal, we must "view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and *permitting the jury to determine the weight and the credibility of the evidence.*" (Emphasis added). Indeed, we are to sustain the jury's conclusions if " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Poston,* 902 F.2d 90, 94 (D.C.Cir. 1990) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

On the evidence in this case, we hardly think a rational juror would be precluded from finding the essential elements of the crime charged beyond a reasonable doubt. Howard and Stewart testified that they asked for cocaine, that they were led to appellant, that appellant was holding a plastic bag, and that the plastic bag was later found to contain cocaine. Recognizing the confluence of testimony on these points, we are in no position to overturn the jury's verdict for a lack of incriminating evidence.

### III.

We find no reversible error resulting from the prosecutor's statements regarding perjury, the trial court's reading of Howard's testimony, or the transcription error. Finally, we think the evidence adduced at trial sufficient to sustain the

jury's finding of guilt. Appellant's conviction is

*Affirmed.*