23 F.3d 404
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Eric WHITE, a/k/a Tiger, a/k/a Eric Carter, a/k/a Eric
Barnes, a/k/a Erick Barnes, a/k/a Eric Keene,
a/k/61a Eric Kane, a/k/a Eric Tiger,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Eric WHITE, a/k/a Tiger, a/k/a Eric Carter, a/k/a Eric
Barnes, a/k/a Erick Barnes, a/k/a Eric Keene,
a/k/a Eric Kane, a/k/a Eric Tiger,
Defendant-Appellee.
 Nos. 92-5887, 92-5888.
 United States Court of Appeals, Fourth Circuit.
 Argued June 10, 1993.
Decided May 11, 1994.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CR-92-256-A)
 Argued William Moses Kunstler, New York, NY, for appellant.
 Thomas More Hollenhorst, Asst. U.S. Atty., Alexandria, VA, for appellee.
 On Brief: Ronald L. Kuby, New York, NY, for appellant.
 Richard Cullen, U.S. Atty., Alexandria, VA, for appellee.
 E.D.Va.
 AFFIRMED.
 Before HALL, PHILLIPS, and LUTTIG, Circuit Judges.
 OPINION
 HALL, Circuit Judge:
 
 
 1
 Eric White appeals his conviction for conspiracy to possess with intent to distribute more than 50 grams of cocaine base ("crack"), distribution of more than 50 grams of crack, and the attempted murder of a potential government witness. The government cross-appeals the 360-month sentence imposed under the Sentencing Guidelines. We affirm both the convictions and sentence.
 
 
 2
 * On May 21, 1992, Darak Brooks and Major Robinson were arrested in Virginia after a search of their car revealed 2.983 kilograms of crack. Robinson decided at once to cooperate and told the police that he, Brooks and two confederates were on their way from New York City to complete a drug deal. The police staked out the meeting place and arrested George Ellis, Jr., and Lloyd White, Eric's brother. Eric White had asked Robinson to take the drugs to Virginia, and Lloyd was to follow and contact the buyer when they arrived. Robinson had delivered two kilograms of crack to Virginia for Eric White some three weeks earlier.
 
 
 3
 While out on bond, Robinson was approached by Eric White and asked to come to meet a friend, Taj Parker. After they met, according to Robinson, White told Parker to "do it," at which point Parker shot and wounded Robinson. White and Parker were arrested thereafter.
 
 
 4
 Brooks, Lloyd White, Robinson and Ellis all pleaded guilty to conspiracy charges and cooperated with the government.[1] Eric White was found guilty on all counts after a one-day jury trial and was sentenced as a career offender to 360 months. He appeals his convictions, and the government appeals the sentence.
 
 II
 
 5
 During the course of giving the jury its instructions, the district judge explained that the verdict
 
 
 6
 must be unanimous. Each of you must agree to it. Do not be concerned that each of you cannot remember everything that was said. That is why we have 12 jurors instead of one. No one juror is expected to remember everything, but some of you will remember parts of it, and that will remind others of other parts of it; and, collectively, you can recall what went on in the case and what the evidence was. And it will have to be your recollection, since it will not be permissible to begin reading back to you portions of the testimony. (emphasis added)
 
 
 7
 White objected to "the Court prohibition against read-backs." The court responded that "the problem with that is that if they want one thing to be read back that is favorable to the Government, then you want something that is balancing, and before you know it you have got the whole trial read back to them." On appeal, White contends that this blanket prohibition of read-backs is reversible error.
 
 
 8
 * The trial court certainly has the discretion to rule on specific requests for read-backs. See, e.g., United States v. Davis, 974 F.2d 182, 189 (D.C.Cir.1992), cert. denied, 113 S.Ct. 1434 (1993). As a matter of judicial economy, the better practice in many cases may well be to settle juror disputes over testimony by having disputed portions reread. See United States v. Criollo, 962 F.2d 241, 244 (2nd Cir.1992) ("It strikes us as far better to try to have such disputes resolved by read-backs, rather than to end up with a hung jury, a mistrial and another trial."). Each request should be considered individually:
 
 
 9
 The factors the judge should consider in responding to a jury's expressed desire to rehear testimony include whether the request is "reasonably well-focused," whether there is any "physical or logistical impairment to reading" the testimony back, and the amount of time the procedure would probably consume. In a nutshell, the judge must weigh the reasonableness of the request, the ease or difficulty in compliance, and what is likely to be gained or lost.
 
 
 10
 United States v. Akitoye, 923 F.2d 221, 226 (1st Cir.1991) (citations omitted). Because a blanket prohibition forecloses this means of resolving juror questions, we will assume that the trial court's ruling was error.[2] Far knottier questions remain, however--was the error harmless, and, even more fundamentally, is such an error even amenable to harmless error analysis? B
 
 
 11
 The Supreme Court has recently held that the admission of a coerced confession is amenable to a harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 306-12 (1991) (Rehnquist, C.J., speaking for the Court on this point). In so holding, the Court denominated two categories of constitutional violations that may occur in the course of a criminal proceeding--"trial errors," which are reviewable for harmless error, and "structural defects," which are per se cause for reversal; see also Sullivan v. Louisiana, 113 S.Ct. 2078, 2083 (1993) (Rehnquist, C.J., concurring). The Court described "trial error" as "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Fulminante, 400 U.S. at 309. "Structural defects," on the other hand, "defy analysis by 'harmless error' standards" because they "affect[ ] the framework within which the trial proceeds...." Id. at 309-10. See also Brecht v. Abrahamson, 113 S.Ct. 1710, 1717 (1993) ("The existence of such [structural] defects ... requires reversal of the conviction because they infect the entire trial process.")
 
 
 12
 By way of limning the two categories--trial error and structural defect--the Chief Justice listed sixteen examples of other errors that can be harmless. Fulminante, 499 U.S. at 306-07. These reviewable errors include jury instructions misstating an element of the offense or containing an erroneous conclusive presumption, improper comment on a defendant's silence at trial, and the admission of evidence obtained illegally. Also listed are examples of'structural defects' that are per se reversible error: the lack of an impartial judge, the total denial of right to counsel, the right to a public trial, the denial of self-representation,[3] and the exclusion from a grand jury of members of the defendant's race. Id. at 309-10. The giving of a constitutionally deficient reasonable-doubt instruction was added to this latter group by a unanimous Court in Sullivan v. Louisiana, 113 S.Ct. 2078 (1993).
 
 
 13
 Our task is to decide into which category of errors the read-back prohibition falls. In determining which of these categories a given error belongs, "[t]here is a strong presumption that any error will fall into the [trial error] categor[y]. It is the rare case in which a constitutional violation will not be subject to harmless-error analysis." Sullivan, 113 S.Ct. at 2083 (Rehnquist, C.J., concurring) (citations omitted).
 
 
 14
 Can the effect of a blanket prohibition on read-backs be "quantitatively assessed in the context of other evidence" in the case? The argument for denominating the read-back prohibition as a structural defect is that we cannot assess the effect of the jury's possible confusion if we cannot even tell whether the jury was confused. The danger is that the jurors, unable to agree on what was said on the witness stand and not permitted to ask the court to refresh their collective memory, will base their verdict on a mistaken recollection. Thus (the argument continues), while the guilty verdict might be based in part on something that was not testified to at trial, the appellate court, unable to pinpoint what was (incorrectly) guessed at, would be unable to assess the effect of the jury's misapprehension in relation to the other evidence in the case.
 
 
 15
 Unlike a deficient reasonable-doubt instruction, "which vitiates all the jury's findings" and which results in no valid verdict or "object upon which harmless error scrutiny can operate," Sullivan, 113 S.Ct. at 2082, the read-back prohibition does not fundamentally alter the fact-finding process. Other errors affecting the jury's deliberative process have been categorized as trial errors that are amenable to review for harmless error. See, e.g., Rose v. Clark, 478 U.S. 570 (1986) (erroneous burden-shifting instruction). Each juror, after proper instructions, found that each fact necessary to show each element of each offense of conviction was proved beyond a reasonable doubt. The read-back prohibition simply does not approach the few acknowledged structural errors in terms of the latter group's fundamental role in our system of justice or in the importance to the fact-finding function.
 
 
 16
 Of course we have no way of knowing whether the jury in White's trial would have asked for a read-back of any testimony, just as a reviewing court can never know with absolute certainty what weight a jury put on an erroneously admitted piece of evidence. It is difficult, and no doubt sometimes nigh impossible, to gauge the effect on a jury's verdict of, say, a coerced confession, but we are bound to do so when presented with such a case. The difficulty of applying the harmless error test in some (or even most) cases, however, is an inadequate basis for declaring a per se rule for all cases. See Fulminante, 499 U.S. at 312 (noting that the possibility of a "devastating" effect of admitting an involuntary confession "is not a reason for eschewing the harmless error test entirely."). In turning to our review of the effect of the error in this case, we recognize that the difficulty of review increases as the length and complexity of the trial increase.
 
 C
 
 17
 White's trial lasted one day (half as long as the trial in Criollo[4]) and he was the only defendant. The trial judge's decision to prohibit any read-backs was announced after all the evidence had been presented. Four of White's coconspirators, including his own brother, testified for the government, and, collectively, they told a consistent story. White and his girlfriend testified in his behalf. The defense was not based on fine distinctions--Eric testified that he had never met Brooks or Taj Parker, that he had nothing whatsoever to do with the two trips to Virginia, that he never ordered the shooting of Robinson, etc. On appeal, White points to nothing, either in general or in particular, that might have generated confusion among the jurors. Cf. United States v. Zarintash, 736 F.2d 66, 70-71 (3rd Cir.1984) (reversing conviction on grounds that the portion of testimony that the jury asked to be reread, which request was refused by the court, "went to the heart of the jury's determination of guilt or innocence."). Accordingly, we hold that the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967).
 
 III
 
 18
 The Jencks Act, 18 U.S.C. Sec. 3500, together with Fed.R.Crim.P. 26.2(a), requires that any "statement" of a witness (other than the defendant) be given to the party who did not call that witness after that witness has testified. The court ordered pretrial disclosure by the government of all Jencks material. The government, however, failed to produce either its Report of Investigation forms (DEA-6s) concerning its interviews with Brooks, Lloyd White and Robinson, or notes taken by a DEA agent and an Assistant United States Attorney during interviews with Robinson. When the existence of these documents came to light during trial, the court refused to order their disclosure. After reviewing the DEA-6s in camera after trial, the court concluded that there was no violation.[5]
 
 
 19
 The term "statement" is defined at 18 U.S.C.Sec. 3500(e) to mean,
 
 
 20
 in relation to any witness called by the United States ...
 
 
 21
 (1) a written statement made by said witness and signed or otherwise adopted or approved by him; [or]
 
 
 22
 (2) a stenographic, mechanical, electrical, or other recording or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement. Neither the DEA-6s nor the notes taken at the interview constitute "a stenographic, mechanical, electrical, or other recording or transcription...." Moreover, because they were never "signed or otherwise adopted or approved" by the witnesses, these documents do not qualify as "statements" under the Jencks Act. United States v. Foley, 598 F.2d 1323, 1338-39 (4th Cir.1979), cert. denied, 444 U.S. 1043 (1980); United States v. O'Malley, 796 F.2d 891, 900-01 (7th Cir.1986) (prosecutor's notes). It was not an error to not order their disclosure.
 
 IV
 
 23
 After each side had rested, the court discussed the time needed by each side for closing arguments. The prosecutor wanted twenty minutes for his closing and ten for rebuttal, and defense requested forty-five minutes. The judge responded that defense counsel's request was a little long for this case, "but if you run over the half hour, I'll give you some leeway." The next day, as the defense lawyer was nearing the end of his closing, the judge said his time was almost up. The court denied counsel's request for five more minutes, and, after counsel spoke a few additional sentences, the court told him his time was up. Estimates of the length of defense counsel's closing argument ranged from 40.5 minutes (defense counsel) to "40-some" minutes (the court) to 42 minutes (the government).
 
 
 24
 The constitutional right to make a closing argument may clash with the court's right to control the proceedings. See Herring v. New York, 422 U.S. 853 (1975). The district court is given broad discretion in allotting time for closing arguments. Id. at 862. Although the allotment was perhaps not as clear as it could have been, the 30-minute point was exceeded by at least ten minutes, and we find no abuse of discretion by the court's termination of defense counsel's summation.
 
 V
 
 25
 To bolster Ellis's credibility by perhaps dispelling the impression that Ellis was getting off easy in return for his testimony, the government asked him (on direct) about whether he had agreed in his plea agreement to forfeit to the government his "interest, whatever that is," in his home. Although defense counsel had been informed the day before trial that the government would not in fact be seeking "formal" forfeiture of the house because of the heavy liens on it, he neither objected to the question nor did he cross-examine on the point. In fact, it was defense counsel who, during his cross-examination of Ellis on another point, elicited the value of the house ($120,000) for the jury. We discern no error here.
 
 VI
 
 26
 In its calculation of the guidelines sentence, the district court accepted the recommendation contained in the probation officer's presentence report and attributed 4.983 kilograms of crack to White. This amount comprises the 2.983 kilograms seized from the car during the May 21 trip, plus two kilograms estimated as the amount taken on the trip three weeks earlier. The government wants to include amounts from other trips about which there was some testimony.[6] Once the drug weight reaches 5 kilograms, the base level goes to 40. With his other points, White's total offense level would be 44, which would (absent a downward departure) yield a life sentence.[7]
 
 
 27
 The government can appeal sentences based on an "incorrect application of the Guidelines." 18 U.S.C. Sec. 3742(b). U.S.S.G. Sec. 1B1.3 (relevant conduct) requires inclusion of all drug amounts for which the defendant can be held accountable. In the case of a conspiracy, the weight includes "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that [the defendant] jointly undertook." Id. at comment. (n.2). The government has the burden below of proving such amounts by a preponderance of the evidence. United States v. Goff, 907 F.2d 1441, 1444 (4th Cir.1990). Because drug weight is a purely factual matter, we review for clear error. Id. We do not find clear error here.
 
 
 28
 The 2.983 kilograms seized during the May 21 arrest is clearly attributable to White, as is the approximately 2 kilograms involved in the April 1992 trip. The government, however, points to testimony from White's coconspirators that tied White to crack deliveries occurring prior to April 1992. The testimony about White's prior involvement in drug dealing, however, did not include dates and other particulars. That these other trips were not part of the conspiracy charged is underscored by each testifying coconspirator's failure to admit any involvement in these trips.[8] We are not prepared to find clear error where the district court refuses to ascribe additional drugs to a joint undertaking involving the defendant on such vague and unreliable testimony.
 
 
 29
 AFFIRMED.
 
 PHILLIPS, Circuit Judge, specially concurring:
 
 30
 I concur in the judgment and in all of the opinion except that part dealing with the district court's anticipatory prohibition of any jury readbacks of trial testimony. The majority holds that here, where the district court gave no reason for the prohibition but that one request would spawn another, it was error to do so, but suggests that had the court given better reasons--such as the shortness and simplicity of the case, clarity of the evidence, etc.--there may have been no error, i.e., that it was a matter within the district court's discretion. Then, essentially relying on a perception that those ungiven reasons were in fact available ones here, the majority holds that the error was harmless.
 
 
 31
 I would instead hold it error to impose such a prohibition for any reason--in any kind of case. Every once in a while, such a prohibition could result in real prejudice--whatever the nature of the case--and there's simply not enough to be gained from the practice to run that risk. There are other ways to protect against waste of court time and to encourage juror attentiveness--the only justifications for the practice that I can see--that don't carry the risk and that are bound to be almost equally effective for those purposes. Juror attentiveness can be admonished by the court and the court's reluctance to allow time-consuming readbacks emphasized; summary rejection of specific requests, where warranted, can re-emphasize the point and discourage further requests. There is not enough, therefore, to be gained from the practice to warrant conferring discretion to use it in any case. Furthermore, as conferred in this decision, it can only cause confusion in the district courts as to the range of the discretion conferred. For these reasons, I'd exercise our supervisory jurisdiction, now that the practice has been challenged in this court, to adopt an absolute rule against its use.
 
 
 32
 Beyond that, there's much to be said for not only making the rule an absolute one, but for declaring its breach an error not subject to harmless error excuse--prejudicial per se error. The Second Circuit recently has done just that in United States v. Criollo, 962 F.2d 241, 244 (2d Cir.1992), for the very good reason that principled harmless error analysis is impossible, there being no way, given the prohibition, ever to know whether a jury may have felt the need for a clarification that could have avoided a prejudice now forever hidden.
 
 
 33
 Having said all that, I nevertheless concur in the judgment of the court. The court properly has found that the district court's prohibition here was an error. I of course agree with that, and my belief that we should make our rule an absolute one would not affect the result here.
 
 
 34
 Finally, despite my misgivings about our ability to conduct fair harmless error analysis given this error's nature, I'd be hesitant to use this case to announce a per se rule applicable to this case. The urge in the district courts to impose such prohibitions is not apparently a widespread one; so far as I am aware, this is the first case in which the practice had been revealed and challenged in this court. The deci sion in this case will effectively signal to the district courts that it is a disfavored practice, to be used, if at all, with great caution. Despite what I consider the unwise conferral of an uncertain range of discretion to use it at all, I am satisfied that our decision will likely act for now as an effective absolute deterrent. If and when that turns out not to be so, a better case than this one on the facts may provide us the chance to re-assess both points. This is not that case.
 
 
 
 [1]
 Parker was indicted in New York City for attempted murder
 
 
 [2]
 We do not hold that a blanket prohibition on readbacks is per se error. Had the trial court based his readback ruling on such factors as the brevity of the trial, the clarity of the evidence from each side, and the simplicity of the issues involved, an anticipatory refusal to entertain readback requests may well have been a justifiable exercise of the court's discretion. As it happened, the trial court's explanation of the reason for the ruling focused only on the possibility that the jury might request that too much be read back
 
 
 [3]
 Denial of the right of self-representation is an anomaly in this short list of structural defects. The Chief Justice cites McKaskle v. Wiggins, 465 U.S. 168 (1984), to support the proposition that denial of such right is per se reversible error. In McKaskle, however, the rationale for rejecting the harmless error test was because the exercise of the right of self-representation "usually increases the likelihood of a trial outcome unfavorable to the defendant...." Id. at 177 n. 8. The effect of the error on the fairness of the trial proceeding is irrelevant
 
 
 [4]
 United States v. Criollo, 962 F.2d 241 (2nd Cir.1992), is the only decision we have been able to locate that holds that blanket prohibitions on read-backs is per se reversible error. In rejecting the government's argument that any error was harmless because the trial was short (two days), the appeals court noted that "[w]e all know that juries not infrequently get into sharp disputes--whether the trial be long or short--as to the testimony of one or more witnesses." Id. at 244
 
 
 [5]
 White contends that the DEA-6s were also Brady material because there are discrepancies between trial testimony and what the three witnesses said at their interviews. The discrepancies are fairly minor, and we find no abuse of discretion in refusing to order the disclosure under Brady
 
 
 [6]
 In the indictment, the conspiracy charged is alleged to have begun "in or about the spring of 1992," and the overt acts supporting the conspiracy count involved only the April 1992 and the May 21 trips. The substantive counts, II and III, likewise only involve these same two trips
 
 
 [7]
 White's sentence was calculated as follows:
 Offense level-Sec. 2D1.1(c)(3) [1.5-5 kg. of crack]--38 Sec. 2D1.1(b)(1) [firearm used to facilitate]--+2
 Sec. 3C1.1 [obstruction of justice]--+2
 Total offense level--42
 Criminal history--Career offender (Sec. 4B1.1)--VI
 Sentence range--360 months to life
 
 
 [8]
 The government also points to Eric's admitted involvement in two drug deals about which there was no other corroborating testimony. These two admissions strike us as possibly being an effort by White to bolster his credibility by admitting some involvement in drugs--"Yes, I've done some bad things, but not the ones they're charging me with"--and we believe the trial court may properly exclude such "admissions" from the drug-weight calculation